UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AMY ANDRE,

        Plaintiff,

v.                              CASE NO.: 97-42-CIV-T-17A

BETTY CASTOR, et al.,

        Defendants.
_____/

**ORDER**

Plaintiff, Amy Andre, a former student at New College, Sarasota, claims Defendants violated her First and Fourth Amendment rights when the campus police seized and retained a sexually explicit video she was projecting onto a wall at the university campus. Both the Plaintiff and the Defendants have filed motions for summary judgment (doc. 122 and doc. 103).[1] After considering the Rule 56 papers for both sides, I find the law enforcement Defendants are entitled to qualified immunity. Accordingly, as to those Defendants, their motion for summary judgment is granted.

*A. Standard of Review*

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S.

---

[1] The parties have consented to my jurisdiction. *See* 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)(emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* Throughout this analysis, the judge must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in her favor. *Id.* at 255.

*B. Background*

On October 4, 1996, during a late-evening event known as the "The *Pillowbook* Palm Court Frenzy," the Plaintiff projected a sexually explicit video on an exterior dormitory wall at the University of South Florida's campus at New College in Sarasota, Florida. As the editor of *The Pillowbook*, a student publication devoted to erotica, the Plaintiff organized the Frenzy to celebrate the publication's second anniversary. She posted flyers on and off campus advertising the program's events -- disc jockeys playing music, a best-dressed contest, and a strip contest (the flyer also warned "down to your underwear, only please -- nudity gets you disqualified") (*see* exhibit A to Andre deposition). Importantly, these notices did not list the sexually explicit video she intended to play, "Annie Sprinkle's Sluts and Goddesses Video Workshop, or How to be a Sex Goddess in 101 Easy Steps," a video which shows a woman painting herself with her menses, women masturbating, engaging in various sexual acts, and using various devices for sexual stimulation.

At around 11:15 p.m., the Plaintiff exhibited "Sluts and Goddesses" for the

unsuspecting viewing audience. About thirty minutes into the film, and just after two women inserted a sexual appliance into the third woman's vagina, Defendant Shideler approached the Plaintiff. Shideler, a sergeant with the campus police who was accompanied by fellow officers, Defendants Lange and Resch, believed the Plaintiff's actions violated the university's student disciplinary rules prohibiting the "public display of sexually explicit or suggestive materials." *See* Fla. Admin. Code § 6C4-6.021(1)(t).[2] He also thought Plaintiff's actions violated state law because minors were likely present during airing of the sexually explicit program.[3] Accordingly, he demanded the Plaintiff stop the broadcast and surrender the cassette. Plaintiff eventually complied, and the officers left the Frenzy.[4]

---

[2] This provision provides:

Sexual misconduct, including sexual harassment and public indecency and voyeurism -- Sexual harassment is conduct of a sexual nature or with sexual implications, which interferes with a student's or an employee's status or performance by creating an intimidating, hostile or offensive educational or working environment. This conduct may include, but is not limited to the following: inappropriate and unwanted touching; the display of sexually explicit or suggestive materials; use of sexually explicit or suggestive language or gestures; and subtle pressure for sexual activity, as well as demands for sexual favors or physical assault. Public indecency is open and notorious actions which are offensive to common propriety, e.g., public sexual intercourse.

[3] Although § 847.0133 (Fla. Stat.) makes it a third-degree felony to transmit or show any obscene material to a minor ( a person under 18), Defendant Shideler submitted a probable cause affidavit to the state attorney for prosecution under § 847.011, a first-degree misdemeanor.

[4] What Shideler did not know at the time is that the Plaintiff did not have permission of the video's copyright holder (Annie Sprinkle) to copy or display the tape publicly. After filing this lawsuit, Plaintiff eventually acquired Sprinkle's approval.

The next afternoon, October 5, the Plaintiff visited the campus police station and unsuccessfully attempted to retrieve the video. On October 6, she returned and spoke to Defendant Shideler, who informed her she would need to speak with the evidence custodian as the tape was secured in the evidence locker. The next day, the Plaintiff met with Defendant O'Casio, the official evidence custodian; he explained the State Attorney for Sarasota County planned to review the tape to decide if criminal charges would be filed. Acting on the instructions of his superior, Defendant Captain Kelly, O'Casio refused return the tape to her.

On or before October 31, 1996, the misdemeanor division chief at the state attorney's office concluded the video met the definition of "obscenity" and the campus police had probable cause to seize it. Although he was prepared to file charges against Plaintiff, the university asked the prosecutor not to take any action. Instead, the university wanted to resolve the matter internally. Consequently, the President of USF, Defendant Castor, convened a committee to decide if Plaintiff acted appropriately and within the code of conduct of New College, the rules and policies of the state's university system, and the laws of Florida. She directed it report and make recommendations to Defendant Tighe (USF Provost), Defendant Michalson (USF-New College Dean), and her regarding any disciplinary actions that should be taken against the Plaintiff.

In January 1997, the Plaintiff filed this action under 42 U.S.C. § 1983 alleging the Defendants, acting individually and in their official capacities, violated her First and Fourth Amendment guarantees by seizing and thereafter denying her possession of the sexually explicit tape she displayed at the Frenzy. She seeks declaratory and injunctive

relief plus compensatory and punitive damages and attorney's fees.

The Defendants subsequently moved to dismiss the complaint raising qualified immunity and Eleventh Amendment immunity. Chief United States District Judge Elizabeth A. Kovachevich granted Defendants Tighe and Michalson's motions to dismiss on qualified immunity, but retained them as defendants in their official capacities; she denied the motion to dismiss as to all remaining Defendants. Those Defendants (Castor, Nixon, Shideler, Lange, Resch, O'Casio, Kelly, Schenck, and Morris) then appealed. The Eleventh Circuit reversed that decision in part, finding that while Shideler, Lange, Resch, O'Casio, and Kelly were not entitled to qualified immunity, Defendants Castor, Nixon, Schenck, and Morris were entitled to the defense. Thus, Plaintiff continues to maintain her action against Defendants Castor, Nixon, Schenck, Morris, Tighe, and Michalson in their official capacity and against Defendants Shideler, Lange, Resch, O'Casio, and Kelly in their official and individual capacities.

At some point during all this, the Plaintiff graduated from New College. She has no affiliation with the university at this time. She presents no evidence she has suffered any damages due to the Defendants' actions, besides her claim they denied her right of expression. No evidence exists in the record before me that any university officials, including these Defendants, negatively commented about her conduct in her official academic record.[5]

C. *The Parties' Contentions*

---

[5] If anything, the Plaintiff benefited from the university's persuading the state attorney from prosecuting her for violating state obscenity laws.

AO 72A
(Rev.8/82)

Conceptually, Plaintiff's arguments focus on two temporal events, the video's seizure and its retention. First, Plaintiff asserts *Roaden v. Kentucky,* 413 U.S. 496 (1973) controls and prohibits *any* warrantless, content-based seizure of expressive materials. She contends *Roaden's* contours are so clear any reasonable official would have understood that confiscating the cassette was unlawful. Next, she essentially argues the campus police and the university Defendants waited too long to seek a judicial determination about obscenity and illegally kept the video. These actions deprived her of her First Amendment right of expression.

The Defendants, on the other hand, claim they are entitled to qualified immunity for their discretionary actions. They contend the facts of this case, as developed in discovery, are materially different from *Roaden's* and satisfy the exception to the warrant requirement approved by the *Roaden* Court; namely, exigent circumstances existed for campus police to prohibit the showing of sexually explicit material to minors and to enforce university rules regarding the exhibition of such items.

D. *Discussion*

If a government official acts within the scope of his or her discretionary authority and does not violate clearly established law, the doctrine of qualified immunity protects the official. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). The Eleventh Circuit applies a two-part analysis to a government actor's assertion of qualified immunity. First, the official must prove the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. Second, if the official meets this test, the plaintiff must show the official's conduct violated clearly established law. *Harbert*

6

*International, Inc. v. James,* 157 F.3d 1271, 1281 (11th Cir. 1998). Only this last part of the test is at issue here, and the Plaintiff must demonstrate that the pre-existing law dictates, "that is, truly compel[s] (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Id.* at 1284 quoting *Lassiter v. Alabama A & M Univ.* 28 F.3d 1146, 1149-50 (11th Cir. 1994) (*en banc*). Only the obviously incompetent or lawless official will not be shielded by qualified immunity. *Id.*

### 1. the seizure

In *Roaden,* a sheriff and a prosecutor purchased tickets to a drive-in theater and watched a film called "Cindy and Donna." Both concluded the film was obscene and that others could see it from a road outside the drive-in. Consequently, the sheriff seized the film and arrested the projectionist for exhibiting an obscene film in violation of Kentucky law. A jury likewise found the film obscene and convicted the defendant. The Supreme Court, however, reversed finding the warrantless seizure to be unreasonable under Fourth and Fourteenth Amendment standards. Holding the seizure of arguably First Amendment materials requires a heightened standard under the Fourth Amendment, the Court determined the arresting officer could have easily obtained a warrant after a judicial determination of obscenity. The Plaintiff basically argues *Roaden* creates a bright line rule: the warrantless seizure of arguably First Amendment items by state actors in *any* set of circumstances is illegal (emphasis Plaintiff's). I do not read *Roaden* so broadly.

The *Roaden* Court, after examining its prior cases, emphasized not only the nature of items seized but the "setting in which they were taken." 413 U.S. at 503. These cases,

7

like *Roaden,* involved state actors confiscating films or books from commercial establishments. The Court's reason for making this distinction is plain.

> Moreover, ordinary human experience should teach that the seizure of a movie film from a commercial theater with regularly scheduled performances, where a film is being played and replayed to paid audiences, presents a very different situation from that in which contraband is changing hands or where a robbery or assault is being perpetrated. In the latter settings, the probable cause for an arrest might justify the seizure of weapons, or other evidence or instruments of a crime, without a warrant (citations omitted). Where there are exigent circumstances in which police action literally must be "now or never" to preserve the evidence of the crime, it is reasonable to permit the action without prior judicial evaluation.

*Id.* at 505.

Other courts have abided by the *Roaden* Court's focus on the setting for the seizure. In *Smith v. United States,* 505 F.2d 824 (6th Cir. 1974), federal agents arrested several persons in a motel room and seized hard-core pornography films they were transporting. Noting *Roaden's* sensitive application of the Fourth Amendment to presumptively First Amendment material, the Sixth Circuit, nonetheless, found the warrantless seizure to meet *Roaden's* standards. The defendants were not operating a bookstore or a motion picture in which they had invited the public to screen. The setting was hardly one to presumptively invoke First Amendment protection. *Smith,* 505 F. 2d at 829. *See also State v. Miller,* 372 N.E.2d 1378 (Ohio App. 1st 1977) (warrantless seizure of sexually explicit films shown at a "one-shot" screening not advertised to the public met *Roaden's* exigent circumstance demands).

The Plaintiff's case probably falls somewhere between the *Roaden*-like ones where films are being shown regularly at commercial establishments and those in *Smith* and *Miller* involving the underground sale or exhibition of arguably protected materials.

8

Clearly, however, the exterior dormitory wall is not a commercial drive-in theater. The Plaintiff cannot equate the Frenzy to a regularly scheduled screening for "Annie Sprinkle's Sluts and Goddesses Video Workshop, or How to be a Sex Goddess in 101 Easy Steps." No one, other than those whom Plaintiff may have confided, knew about the upcoming attraction. Nothing in her flyers even remotely suggested such a sexually explicit program would be shown. To say Sprinkle's video was a "sneak preview" is an understatement; a "sneak preview" did not even make the playbill. The Plaintiff's exhibition amounted to a "one-shot" event.[6]

Furthermore, contrary to the Plaintiff's averments in her complaint, the proof does not show students used the Palm Court area as a place to exhibit sexually explicit films (doc. 1, ¶ 20). All those deposed, including Plaintiff, had no first-hand knowledge that students had ever used the Palm Court as a common forum for screening sexually explicit films. In fact, it appears the only other time a sexually explicit film was shown at the Palm Court, students protested leading to the creation of a courtesy policy. That film, an animated production entitled "Japanimation," contained at least one scene of a rape. The courtesy policy encouraged students to take others "into consideration when choosing movies to be projected in Palm Court." Plaintiff could not identify any other sexually

---

[6] The Plaintiff seems to attach some significance to the fact that she screened the event before showing it and decided it was suitable for the program. Frankly, her imprimatur is meaningless even assuming it to be true (while I accept her version for Rule 56 purposes, the contrary seems more plausible; if she considered the film appropriate she would have advertised it in her flyer). Extending Plaintiff's reasoning would be to give First Amendment protection to the person who thought it appropriate to falsely yell fire in a crowded theater.

9

explicit film shown in Palm Court during her five years as a student, nor could she point to any specific occasion when she might have viewed one (see Andre Deposition, pp. 57-58). Likewise, the campus security officers, who routinely patrol Palm Court parties, were unaware of any other sexually explicit film being shown at Palm Court (see Depositions of Lange, p. 34; Shideler, pp. 54-55; Resch, p. 34.)[7]

Lastly, Defendant Shideler's conclusion that minors were likely present in the audience was objectively reasonable. He surveyed the crowd, was familiar with the student body, and had experience with university events and those who attended them.[8] His decision that he needed to take some immediate action to stop the showing of the film was also objectively reasonable given these circumstances and the university policies regarding sexually explicit conduct.

Plaintiff's argument that the Defendants have presented no proof minors were in fact present misses the point. As the Supreme Court emphasizes, probable cause is a common sense, nontechnical conception that deals with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (citations omitted). Besides, the doctrine of qualified immunity gives the police officer, who is making

---

[7] Defendant Shideler testified he has been with the university since 1975 and has observed a majority of the Palm Court parties. This was the first time he witnessed a sexually explicit film being shown (Shideler deposition at pp. 53-55).

[8] Both Officers Resch and Lange during their depositions corroborated Shideler's conclusion that high school students were present in the crowd (Resch deposition at pp. 37-38; Lange deposition at p. 40). Resch added he saw some in the crowd wearing Sarasota High School sweat shirts or baseball caps.

decisions on the spot, some leeway in assessing the situation. The precept recognizes "that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and [the Supreme Court has] indicated that in such cases those officials -- like other officials who act in ways they reasonably believe to be lawful -- should not be held personally liable. . . . The same is true of their conclusions regarding exigent circumstances." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (citations omitted).

While *Roaden* sets forth the general principle that an official's warrantless seizure of arguably protected First Amendment material is presumptively invalid, the Plaintiff must do more than cite broad legal truisms to pierce a state actor's qualified immunity defense. She must point to a factually analogous case which establishes the Defendants' conduct violated clearly established constitutional law. *Harbert International, Inc.*, 157 F.3d at 1285. Plaintiff falls short of this mark. *Roaden* is not so broad as to make all warrantless seizures of potential First Amendment material illegal, and the facts of this case are not on all-fours with controlling legal precedent. Indeed, *Roaden* emphasizes the setting for the seizure is critical. This reasoning comports with the Court's later decision that a university has authority to establish reasonable time, place, and manner restrictions even on First Amendment activities. *See Widmar v. Vincent*, 454 U.S. 263, 267-68 n. 5 (1981). Accordingly, I find the law enforcement Defendants are entitled to qualified immunity as to those claims that the seizure violated clearly established law.[9]

---

[9] The Supreme Court has acknowledged limitations may be placed on presumptively protected First Amendment speech if it is sexually explicit and the audience may include children. *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986) (upholding

11

### 2. *the post-seizure events*

The second part of Plaintiff's claim is that the law enforcement Defendants infringed her First Amendment rights by not promptly seeking judicial review after confiscating the tape. This claim is nearly identical to the one she unsuccessfully made against the university officials; a charge the Eleventh Circuit blocked after finding the qualified immunity defense applied. The Plaintiff cites no case that makes it obvious to all reasonable government actors that what the law enforcement Defendants were doing violated federal law. *Harbert International, Inc.,* 157 F.3d at 1284. At best, she contends *Roaden* and its companion case *Heller v. New York,* 413 U.S. 483 (1973) plainly warned these Defendants their retention of the video was illegal. A review of the post-seizure events and the law does not support her effort to defeat a qualified immunity defense.[10]

On October 7, the Monday after the Frenzy, Defendant Shideler prepared an offense incident report and a probable cause affidavit for a violation of Florida Statutes § 847.011 (showing an obscene video). He then forwarded these to his superior, Sergeant O'Casio, who, after reviewing them, forwarded them to Captain Kelly. Kelly next sent

---

school's sanctioning of student who made an offensively lewd and indecent speech); *Ginsberg v. New York,* 390 U.S. 629 (1968) (upholding a New York statute banning the sale of sexually oriented material to minors even though it was entitled to First Amendment protection with respect to adults).

[10] In *Heller,* a judge after viewing a film determined it to be obscene and authorized a warrant for its seizure. The defendant, who was convicted for exhibition of an obscene film, argued he was entitled to an adversary hearing on the issue of obscenity before the seizure. The Court held such a hearing was not required under the circumstances.

this to the state attorney (this included a copy of the tape Shideler made sometime before October 15).[11] A couple of weeks later (October 31), the prosecutor informed Shideler by letter he would not prosecute the case because the university wanted to take care of the matter in-house. From then, the Plaintiff's fate, as well any decision about what to do with the video, rested with the university.

The Eleventh Circuit, by deciding the university officials were entitled to qualified immunity, edited the Plaintiff's script. If university officials tasked after October 31, 1996, with reporting, reviewing, and making decisions about the video are entitled to qualified immunity, it follows then the law enforcement Defendants are also entitled to qualified immunity for their actions after that same date. The Eleventh Circuit's reasoning effectively pares down Plaintiff's temporal complaint to just over a two week period -- from October 4 through October 30. The issue restated is now: did the law enforcement Defendants violate clearly established law by retaining the tape without seeking judicial review during this limited time?[12]

The Plaintiff does not point to a constitutionally-mandated bright line date for seeking judicial review after a warrantless seizure in a setting such as this. Certainly, the Eleventh Circuit concluded none existed for the university officials, and little reason exists to continue the dichotomy between Defendants the Plaintiff urges. Accordingly, applying the same qualified immunity analysis as outlined above, I find the law enforcement

---

[11] Shideler returned Plaintiff's tape to the evidence storage.

[12] Shideler forwarded a copy of the tape to the state attorney sometime before October 15.

Defendants are entitled to qualified immunity.

*E. Conclusion*

For the reasons stated, it is

ORDERED:

1. The Plaintiff's motion for summary judgment (doc. 122) is DENIED.

2. The Defendants' motion for summary judgment (doc. 103) is GRANTED to the extent that Defendants Shideler, Lange, Resch, O'Casio, and Kelly are entitled to qualified immunity against the Plaintiff's claims that they be held liable in their individual capacities.

3. The Plaintiff shall show cause within 10 days why those claims seeking declaratory and injunctive relief should not be dismissed either because they are moot or the Plaintiff lacks standing. In particular, the Plaintiff should address the following issue: does a justiciable case or controversy as defined by Article III currently exist given that no claim for damages is pending and the Plaintiff is no longer a student at New College. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).[13] Defendants have 5 days to respond to Plaintiff's argument.

4. Per the discussions at the final pretrial conference, the trial is continued until

---

[13] Per *Lujan*, the irreducible minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, a causal connection must exist between the injury and the conduct complained about. Lastly, it must be likely, as opposed to merely speculative that the injury will be redressed by a favorable decision. 504 U.S. at 560. Plaintiff's application to enjoin future conduct implicates *Lujan's* first requirement; *Lujan's* third prong affects her request for declaratory relief.

further order of the Court.

DONE AND ORDERED at Tampa, Florida on May 11, 2000.

*/s/ Mark A. Pizzo*
MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

cc: Counsel of Record